**Charles ELLIOTT and Thelma Elliott**

v.

**UNION INDUSTRIELLE & MARITIME**

v.

**I. T. O. CORPORATION OF BALTIMORE.**

Civ. No. 71–790–T.

United States District Court,
D. Maryland.

July 26, 1973.

Joseph F. Lentz, Jr., and Monfred, Lentz & Hooper, Baltimore, Md., for plaintiffs.

John T. Ward and Ober, Grimes & Shriver, Baltimore, Md., for defendant and third-party plaintiff.

David R. Owen and Semmes, Bowen & Semmes, Baltimore, Md., for third-party defendant.

THOMSEN, District Judge.

Plaintiff, the foreman of a gang of longshoremen, suffered a stroke on December 26, 1969, while sitting at a desk·

in an office filling out his daily report form. The men had been engaged in helping to load grain onto a vessel moored at the Western Maryland Grain Elevator Pier, Port Covington, Baltimore. Plaintiff claims that the stroke was caused by unusually heavy work and worry during the day because the vessel on which he worked was unseaworthy and its owner was negligent in various respects, particularly because the vessel was not equipped with booms or other devices for lifting heavy equipment, because of the alleged incompetence of most of the longshoremen supplied by the local union (of which plaintiff was a member) and because of an alleged failure to have a safe plan of operation.

Defendant denies the alleged unseaworthiness and negligence, and denies that plaintiff's stroke was caused by his work on defendant's vessel or any worry associated therewith.

Defendant has filed the customary third-party claim against the stevedoring company. Both defendant and third-party defendant have raised questions of res judicata and collateral estoppel, based upon the denial of plaintiff's claim against the third-party defendant in proceedings under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. The compensation claim was disallowed by the Deputy Commissioner after a hearing at which the claimant and five doctors testified and the hospital records, weather report and other exhibits were filed. At the trial of the instant case, the parties stipulated that the entire record in the compensation case should be considered as evidence in this case; plaintiff again testified at length, and other witnesses were produced.[1]

Questions of credibility, particularly of the plaintiff, are important in this case. Defendant and third-party defendant agree that plaintiff is an honorable man and was a conscientious worker. There are, however, many discrepancies between the historical facts stated by the plaintiff (a) to the doctors during his weeks in the hospital, (b) in the compensation case, (c) in his deposition in this case, and (d) on the stand during the trial. There are also discrepancies between plaintiff's testimony and contemporary records, including the hospital record and entries which plaintiff had made on the daily report.[2] The court has considered the credibility of all the witnesses and the facts assumed by the several doctors in making its findings of fact contained in this opinion.

### Facts

For many years the port of Baltimore has provided warehouse and other facilities for the export of grain. The volume of the traffic has varied; for some years before 1969 the volume was low, and many of the younger or more eager members of the grain local had left it to join the general cargo or checkers locals, where they could make more money. Nevertheless, plaintiff and his friend Chester Lowicki, both of whom qualified as foremen but liked to work together, alternating as foreman and gearman, were kept fairly busy, making a little over $8,000 a year. For some months before December 1969 plaintiff, then 52 years old, who had been a longshoreman since he left school, had been unhappy about the poor quality of the men supplied by the local union on a rotation basis to the various gangs, because of their average age and unwillingness to follow all his orders, and had expressed an intention, how serious it is hard to say, to relinquish his status and become a "snapper" again.

---

1. The court has not treated the decision, findings of facts or reasoning of the Deputy Commissioner as evidence herein, except in connection with the issues of res judicata and collateral estoppel. The court has considered the rest of the record as evidence for all purposes.

2. It would prolong this opinion unduly to recite the discrepancies.

Meanwhile, the shipping companies had found that carrying grain in general cargo vessels was costly, because of the large amount of manual work required to instal "grain fittings", and to load and spread the grain throughout the holds of such vessels. For a while oil tankers were frequently used, but they had certain disadvantages for the grain trade. Shortly before 1969, however, two new types of bulk carriers were introduced, one designed solely for the carriage of bulk cargoes such as grain, and the other designed primarily for that purpose, but provided with booms and masts to enable it to handle general cargo in some or all of its holds. The second type is called a combination carrier.

The Eglantine, the vessel on which plaintiff worked on December 26, 1969, is a pure bulk carrier. Between the forecastle, which carries the machinery for docking the vessel and a crow's nest for the lookout, and the aft superstructure, which contains the living quarters for the crew, engine room, pilot house and bridge, there are seven large holds, with wing tanks (sometimes referred to as Butterworth tanks) on both sides of each hold. The hatch covers of each hold open sideways from midships out, to create a large opening through which grain can be loaded by means of a chute, sometimes called a spout, from the side of a warehouse. The wing tanks are also loaded with grain, through three openings on the starboard side and three on the port side of each hold. The holds and the wing tanks are so designed that the angle of the upper third of the sides of each hold is so related to the angle of repose of the grain that very little manual leveling is needed, and the holds can be rapidly filled.

An employee of the warehouse, stationed near the top of the chute, controls the flow of the grain and the length and angle of the chute, which has a retractable sleeve at its lower end. Two longshoremen, known as snappers, equipped with shovels, watch the loading operation at each hatch, and at each opening into the wing tanks, to be sure that the grain keeps flowing and does not clog up in the chute.

When the vessel is moored to a warehouse pier, the tanks on the in-shore side, as well as the holds, are loaded directly from the warehouse spout, which, as noted above, can be moved, lengthened and shortened by the warehouse employee located near the top of the spout.

To load the off-shore wing tanks is not so simple. The spout must be extended across the vessel. This is accomplished by attaching to the end of the spout an "ice-cream cone", which reduces the diameter from 4 ft. to 2 ft., then attaching one or more extensions or sleeves, through which the grain passes into the tank opening. The court will refer to the permanent portion of the chute as the spout, and to the spout, with extensions added, as the chute. During the loading of the off-shore tanks of the Eglantine on December 23, 24 and 26, 1969, an "ice-cream cone" was attached to the spout, a 20 ft. aluminum extension was attached to the cone, and a 12 ft. aluminum extension or sleeve was attached to the first extension. To accomplish this, ropes were used to lift and hold the end of the piece which was to be fitted onto another piece and the men would stand on the deck or on a hatch cover, on which the lower end of the spout or chute and/or the piece might be rested. In order to tie the pieces properly, it was sometimes necessary for a man to climb one of the stanchions,[3] which were equipped with J-type rungs, like those on utility poles. To load the second and third openings opposite a particular hold, the chute was pushed or pulled by the longshoreman the short distance between the openings. When the off-shore openings beside another hold were to be used, the assembly was unrigged and rigged again piece by piece.

---

3. There was a stanchion 15 ft. high between each of the hatches to provide lighting.

The "ice-cream cone" was made of steel, the extensions of aluminum; they weighed from 100 to 200 lbs. apiece. Steel or tin extensions are sometimes used.

On December 23, plaintiff as foreman and Lowicki as gearman were called to work for I.T.O. in loading the Eglantine. Plaintiff was unhappy with the seven-man gang sent by the union, because five of them were "old", although all were experienced. Neither that day, nor on the 24th or 26th, did he ask the union, I.T.O. or any officer of the ship for other men. They loaded various holds and tanks on the 23rd and on the morning of the 24th, knocking off at noon. No untoward incident occurred, but, as usual, plaintiff helped the men with their work.

Christmas Day was very cold, and six inches of snow fell. Plaintiff and Lowicki came to the ship at about 7 a. m. on the 26th. The temperature was around 32°, and the snow prevented Lowicki from using a small truck to move the extensions and cones to the side of the ship from the place where they were stored; plaintiff and Lowicki therefore pulled them, like a sled, for distances of 10 to 60 ft. At 8 a. m. the other men arrived; one was missing, so plaintiff arranged to have his son, a good worker, fill his place. The son arrived in time to be reported working all day. The longshoremen lifted the extensions onto the deck as usual. Between 8 a. m. and 9:30 a. m., two chutes were rigged, in the manner described above, with an "ice-cream cone", a 20 ft. aluminum extension and a 12 ft. aluminum extension, to reach the openings in the #4 and #6 starboard (off-shore) tanks. Plaintiff helped with that work, climbing a stanchion on one occasion to adjust one of the cones and tie it properly to the end of the spout. The temperature was close to 32° and his hand was cold when he pulled his glove off to tie the knot.

No further rigging was done, but one of the rigs was disassembled, a simple and easy job, just before or just after the lunch hour. Nothing untoward or unusual happened all day, until about 4: 15 p. m. At 4 p. m. plaintiff had left the ship in order to tell the warehouseman that they had run out of grain and what kind of grain was needed. Plaintiff went up a gangway to the first level above the deck and down another gangway to the dock, where he went to the office, telephoned the warehouseman and started to fill out his daily report. When he was making entries for the period beyond the lunch hour, he noticed that his hand felt numb, then his foot, and his mouth twisted. He was taken to the hospital, where he and his son gave a history. Plaintiff had had hypertension for some months at least before his stroke, and had been discharged from the Navy in 1945 after having had rheumatic fever. There is nothing in the hospital record, then or later, to indicate that anything connected with his work had anything to do with his condition. The diagnosis was "cerebral vascular accident—probably occlusive".[4] There was a hemi-paresis on the right side secondary to the stroke, and a thrombophlebitis of the left calf developed, with a secondary pulmonary embolus. He was discharged on February 1, 1970, received treatment for some months thereafter, and still receives medication from a physician whom he sees periodically. He is disabled from doing any work he is qualified to do.

His medical bills, which amounted to $4,827.68 by January 1972, were paid by the STA–ILA Benefits Trust Fund. He has been receiving some health benefits as well as Social Security payments.[5]

His work life expectancy was less than that of a man without high blood pressure (which would have been 13 years in 1969), how much less need not be found, because of the decision on liability.

4. Some unidentified person changed the word "occlusive" to "bleed" at some time. The court finds and concludes that it is immaterial for the purposes of the case whether it was an "occlusion" or a "bleed".

5. His average annual wages would have been about $10,000 during the past 3½ years.

## Discussion and Conclusions

■ A. Plaintiff argues that the ship was unseaworthy and her owner negligent in the following respects:

(1) That there were no booms to raise the extensions or to assist otherwise in rigging the chute. The court finds and concludes that the weight of the extensions was not such that booms were necessary to prevent the vessel being unseaworthy.

(2) That there was no catwalk (such as is common on tankers) or other structure on which the weight of the chute could be rested while the extensions were added, on which men could stand during the rigging operation, and on which the chute could be rested during the loading. The court finds and concludes that the hatch covers, the tops of which were 12 ft. above the deck, were better suited for the purposes referred to than a catwalk would have been.[6] The stanchion was adequate for the purposes for which it was used by plaintiff. No additional equipment was needed for the work which was being done on December 23, 24 and 26.

(3) That defendant failed to have a safe place of operation. The court finds and concludes that the plan of operation was the normal plan of loading the vessel, that plaintiff and his gang followed the customary procedures for loading such vessel, and that there was no failure to have a plan of operation which was reasonably safe for the work intended and done.

(4) That defendant failed to provide plaintiff with a sufficient number of competent co-workers. The court finds and concludes that there was no such failure. The members of the gang were chosen by plaintiff's local union on a rotation basis; the work was not unusually heavy, and the gang was capable of doing it, and did it, with some help from plaintiff when he considered it easier to do something himself rather than insist that one of the men do it. Plaintiff did not ask the ship's officers, the stevedoring company or the union to send him other men.

■ Plaintiff has failed to prove that the vessel was unseaworthy or that the shipowner and its representatives were negligent. It is not necessary to decide whether the vessel would be seaworthy for other purposes or under other circumstances.

■ B. Moreover, the court finds and concludes that plaintiff has failed to prove that his stroke was caused or precipitated by any physical strain or emotional tension in the course of his work on the Eglantine. The weight of the persuasive medical evidence is that there was no such connection. Although this is a sympathetic case, the court must find and conclude that plaintiff has not proved a case entitling him to recover.

C. This conclusion makes it unnecessary to decide whether plaintiff's claim is barred by res judicata or collateral estoppel because the claim which he filed against his employer, the third party defendant herein, was denied by the deputy commissioner on the grounds:

"(1) That the illness of the claimant was not causally related to the conditions of employment, but that it was the result of the natural progression and consequence of a pre-existing cerebral vascular disease.

"(2) That the claimant did not suffer an injury or illness arising out of and in the course of the employment, as alleged."

The deputy commissioner had before him and considered exactly the same medical evidence and substantially the same factual evidence that has been presented in this case.

In Biggs v. Norfolk Dredging Co., 360 F.2d 360 (4 Cir. 1966), after discussing Reed v. The S. S. Yaka, 373 U.S. 410, 83

---

6. The catwalks on tankers are provided because those vessels are loaded so heavily that the decks are not much above sea level, and a catwalk is necessary for the crew to pass fore and aft.

S.Ct. 1349, 10 L.Ed.2d 448 (1963), the Fourth Circuit held that a man who had filed a claim and recovered compensation from his employer under the Longshoremen's and Harbor Workers' Compensation Act, over a defense that his sole remedy was under the state statute, was not barred from suing his employer thereafter for damages under the Jones Act or general maritime law. The Court added:

"We need not consider the assertion whether the award of compensation by the administrative compensation agencies is a finding that the men were not seamen and are therefore precluded through estoppel by judgment to assert the contrary in a subsequent suit. Admittedly, the action of the agency is sometimes made conclusive, frequently depending on whether the particular issue—such, as here, the status of the claimant—was litigated. (at page 365, with authorities cited in a footnote) * * * The reason * * * is that *Yaka* peremptorily dictates, to repeat, that a seaman-employee, actual or *Sieracki* [Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099], injured aboard his employer's vessel is to be put in the same position as one injured aboard a ship owned by a third party, and in the latter situation, the employee could recover compensation from his employer and still sue the third party for negligence or unseaworthiness. The *Yaka* employee cannot, therefore, be barred ipso facto by any administrative finding or award. * * * *"

The instant case presents a question not decided in *Yaka* or in *Biggs,* as to which the authorities are not unanimous. See, e. g., Hoffman v. New York, N. H. & H. R. Co., 74 F.2d 227 (2 Cir. 1934), cert. den. 294 U.S. 715, 55 S.Ct. 513, 79 L.Ed. 1248 (1935); Segal v. Travelers Ins. Co., 94 F.Supp. 123 (D.D.C.1950); Smith v. Service Contracting, Inc., 236 F.Supp. 492, 495 (E.D.La.1964).

Judgment will be entered for defendant.